N.A.A.C.P. *v.* P.U.C. and Philadelphia Electric Company, Intervenor.

Echols, Jr. *v.* P.U.C. and Philadelphia Electric Company, Intervenor.

Human Relations Commission *v.* P.U.C. and Philadelphia Electric Company, Intervenor.

Argued February 9, 1972, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER and ROGERS. Judge BLATT disqualified herself and did not participate.

*David R. Cashdan,* with him *Berlin, Roisman & Kessler,* and *Nathaniel Jones,* General Counsel, and *Sanford Kahn,* for appellant, N.A.A.C.P.

*Roy Yaffe,* with him *Robert Englesberg, Gerald E. Magaro, S. Asher Winikoff,* General Counsel, and *J.*

*Shane Creamer*, Attorney General, for appellant, Pennsylvania Human Relations Commission.

*Daniel F. Joella*, with him *Ronald Ziegler*, Assistant Counsel, and *Edward Munce*, Acting Counsel, for appellee.

*Ernest R. von Starck*, with him *Kenneth R. Myers*, *Edward G. Bauer, Jr.*, and *Morgan, Lewis & Bockius*, for intervenor.

OPINION BY JUDGE ROGERS, May 4, 1972:

The National Association for the Advancement of Colored People, Inc., (NAACP) and the Pennsylvania Human Relations Commission (PHRC) here appeal from an order of the Pennsylvania Public Utility Commission (PUC).[1]

This is a rate case. The Philadelphia Electric Company (Company), a certificated public utility company supplying electricity in the area of the City of Philadelphia, filed increased rates for electric service before the PUC pursuant to Section 308 of the Pennsylvania Public Utility Law, Act of May 28, 1937, P. L. 1053, as amended, 66 P.S. §1148. PHRC filed a complaint with the PUC requesting that the Company's rate increase be denied until such time as the Company ". . . can demonstrate at a public hearing that it is in compliance with the Philadelphia Human Relations Ordinance, Title VII of the Civil Rights Act of 1964, and Pennsyl-

---

[1] Alvin E. Echols, Jr., a member of the Pennsylvania Human Relations Commission, who, with Andrew G. Freeman, also a member of the Commission, joined in the complaint of the PHRC filed with the PUC, has also appealed to this court. No separate brief or argument was presented in behalf of Mr. Echols. Any reference herein to PHRC as a complainant before the PUC should be taken to include Messrs. Echols and Freeman and any mention of PHRC as appellant, to include Mr. Echols.

vania Human Relations Act," that the PUC "... con-
duct a full public investigatory hearing into the em-
ployment practices of the Philadelphia Electric Com-
pany," that the PUC "... withhold from the respondent
utility all profits guaranteed to it until such time as
it demonstrates that it is in compliance with the PHR
Act," and that the PUC "... if it finds that the Com-
pany is in violation of the fair employment laws order
it to undertake affirmative action programs to recruit
and train blacks, women, Spanish-surnamed Americans
and other minorities[2] for jobs which they have been
previously denied." On the same day this complaint
was filed, the PUC, on its own motion and because
protests as to the increased rates had been filed, en-
tered its order suspending the proposed rates and
launching an investigation to determine whether such
rates were just and reasonable under the Public Utility
Law. More than five months after the increased rates
were filed by the Company, NAACP filed a petition
and an amended petition to intervene in both the com-
plaint proceeding instituted by PHRC and the rate
proceeding ordered by PUC. NAACP also charged the
company with discrimination in employment and asked
for suspension and denial of the rate increases.

The Company moved to dismiss both the PHRC
complaint and the NAACP amended petition on the
ground that their subject matter, employment discrim-
ination, was outside the statutory powers of the PUC.

At this point PHRC filed its own complaint with
itself pursuant to the Pennsylvania Human Relations
Act, Act of October 27, 1955, P. L. 744, as amended, 43

---

[2] Its use of the term "other minorities" suggests that PHRC
regards women as a "minority" group. Census statistics show
women to be a majority. We make the point because the cause of
civil justice is harmed rather than aided by the erroneous asser-
tion that Constitutional and legislative guarantees exist for the
benefit of minorities rather than of persons.

P.S. §951, *et seq.*, charging the Company with discrimination in employment in terms identical with those employed in PHRC's complaint and NAACP's petition to intervene. We are advised that NAACP has not sought to intervene in the proceeding before the PHRC and that no hearings have been scheduled by PHRC on its own complaint since its filing sometime in March of 1971.

The order of the Commission here appealed from dismissed the complaint of the PHRC without prejudice and denied the amended petition of NAACP to intervene. PUC refused to decide whether the issue of discrimination in employment raised by the appellants fell within its jurisdiction or whether it might be determined within the context of a rate proceeding. It concluded that since a complaint raising the same issues was before the PHRC, that body should first determine that issue, after which the PUC would determine its jurisdiction and what action should be taken by it in the premises.

With blithe unconcern for consistency PHRC here urgently espouses a thesis which it just as urgently contested in another case heard by us at the same argument session, to wit, that the PUC rather than the PHRC is the appropriate regulatory agency to determine the existence of and to enjoin racial discrimination. In that case, *Pennsylvania Human Relations Commission v. The Philadelphia Electric Company*, 776 C.D. 1971, decided this day, we concluded that PUC and not PHRC had jurisdiction to determine and order discontinuance of allegedly discriminatory application of rules relating to security deposits, termination of service for delinquency and provision of home economics information and advice. Our holding in that case was based primarily upon the specific grant of authority in the Public Utility Code to PUC to enforce non-

discriminatory rate and service regulations and the absence of such authority given to PHRC by the Pennsylvania Human Relations Act. We here decide that the PUC has no power to regulate a public utility's employment practices, at least in a rate case, because this power is not given to the PUC by the Public Utility Law but is conferred upon PHRC by the Human Relations Act.

The Pennsylvania Human Relations Act empowers PHRC upon a finding of discrimination in employment to order its discontinuance by the offender. The PHRC and NAACP in this case are seeking to create an additional and unquestionably more effective stricture for such activity in the case of public utilities, that is, the suspension or denial of rate increases and, indeed, withholding of all profits under existing rates in the absence of affirmative proof by the public utility that it is *not* engaging in discriminatory employment practices. So bold an assertion demands careful consideration and we have, we believe, given thoughtful attention to the arguments here proffered, and in particular to the excellent briefs of the NAACP and the Company.

Here novel and imaginative proposals are advanced in the interests of those of our citizens who on account of their race have been denied not merely the amenities of life but the very opportunity, through employment, for a dignified existence abundantly available in this country to others. Such a case is so immediately and strongly appealing that perspective blurs. It is therefore important to commence with undisputed basic principles which, for the time being at least, control. Those important here are: (1) That a private person does not violate any constitutional rights of others by discriminating against them in employment: (2) That the Equal Protection clause of the Fourteenth Amendment

of the Constitution of the United States is a protection against discriminatory action by the State only;[3] (3) That a public utility company is entitled as a matter of constitutional right to make a fair return on property which it devotes to public use;[4] (4) That the PUC has only such power as is clearly conferred upon it by statute;[5] and (5) That discrimination in employment by private persons is contrary to the public policy of Pennsylvania, unlawful, may be enjoined by PHRC and, if persisted in, be the occasion for criminal penalties of fine and imprisonment.[6]

The substantive contentions of PHRC and NAACP refine to: (1) That the Public Utility Law, 66 P.S. §1101, *et seq.*, imposes upon PUC the duty to investigate a charge of racial discrimination in a rate case, and (2) that the failure by PUC to examine the em-

---

[3] *See* Lewis, *The Meaning of State Action*, 60 Colum L. Rev. 1083 (1960). Of particular interest to Pennsylvanians among a host of cases on the subject is *Irvis v. Scott*, 318 F. Supp. 1246 (M.D. Pa. 1970), *probable jurisdiction postponed*, 401 U.S. 992 (1971).

[4] Some Pennsylvania cases citing this principle are *Lehigh and New England R. R. Co. v. Public Service Commission*, 79 Pa. Superior Ct. 540, *aff'd* 277 Pa. 493, 121 A. 205 (1922) ; *Bell Telephone Co. of Pa. v. Pa. P.U.C.*, 135 Pa. Superior Ct. 218, 5 A. 2d 410 (1938) ; *Pennsylvania R. R. Co. v. Philadelphia County*, 220 Pa. 100, 68 A. 676 (1908) ; *Pittsburgh v. Pa. P.U.C.*, 182 Pa. Superior Ct. 551, 128 A. 2d 372 (1956). The leading United States Supreme Court cases include: *Smyth v. Ames*, 169 U.S. 466, 18 S. Ct. 418 (1898) ; *Northern Pacific R. R. Co. v. North Dakota*, 236 U.S. 585, 35 S. Ct. 429 (1915) ; *Missouri, ex rel. Southwestern Bell Telephone Co. v. Public Service Commission*, 262 U.S. 276, 43 S. Ct. 544 (1923) ; *F.P.C. v. Hope Natural Gas Co.*, 320 U.S. 591, 64 S. Ct. 281 (1944).

[5] *West Penn Railways Co. v. Pa. P.U.C.*, 135 Pa. Superior Ct. 89, 4 A. 2d 545 (1938) ; *Felix v. Pa. P.U.C.*, 187 Pa. Superior Ct. 578, 146 A. 2d 347 (1958) ; *Northern Pa. Power Co. v. Pa. P.U.C.*, 333 Pa. 265, 5 A. 2d 133 (1939) ; *Rogoff v. The Buncher Co.*, 395 Pa. 477, 151 A. 2d 83 (1959).

[6] Pennsylvania Human Relations Act, 43 P.S. §951, *et seq.*

ployment practices of a public utility prior to granting a rate increase is a violation of the United States Constitution.

## I—THE PUBLIC UTILITY LAW

We have searched the Public Utility Law and examined with special care the sections cited by the appellants for grant of authority in the PUC to examine into the employment practices of a public utility company in a rate case and in such a case to suspend and deny increases if illegal practices are found to exist. We have done so despite the holding of *Meyers v. Pa. P.U.C.*, 164 Pa. Superior Ct. 431, 65 A. 2d 256 (1949), that the PUC lacked power to regulate the employment contracts of public utilities. There a customer complained that a labor contract entered into by the utility was improvident. The Superior Court affirmed PUC's dismissal of the complaint for failure to set forth facts on which the Commission could take jurisdiction, stating with regard to the Commission: ". . . its sole power is to see that in the matter of rates, service, and facilities the treatment of the public by public utility companies is fair." 164 Pa. Superior Ct. at 433, 65 A. 2d at 256, 257. *Northern Penna. Power Co. v. Pa. P.U.C.*, 333 Pa. 265, 5 A. 2d 133 (1939), holds identically. We are further mindful that cases have uniformly held that the PUC was not intended to be a super board of directors for the public utility industry forcing upon the regulated companies general concepts of the public interest. *Bell Telephone Co. of Pa. v. Driscoll*, 343 Pa. 109, 21 A. 2d 912 (1941); *Penn-Harris Hotel Co. v. Pa. P.U.C.*, 166 Pa. Superior Ct. 394, 71 A. 2d 853 (1950). And, bearing in mind always that the PHRC has explicit power over the subject matter here, we must attend the Supreme Court's statement of still valid principles in examining the acts or suggested actions of agencies of state government, in *Swarthmore Bor-*

*ough v. Public Service Commission,* 277 Pa. 472, 478, 479, 121 A. 488, 489, 490 (1923):

"If the commission were allowed to exercise authority not conferred on it, either in specific words or as necessarily comprehended in some other power expressly granted (Citizens P. Ry. Co. v. Pub. Serv. Com., 271 Pa. 39, 54), all the contracts and the general management of the business of the public utilities of Pennsylvania might, in course of time, be subjected to the control of that body, although no such condition of affairs is contemplated by the act. In other words, the evil effects of not adhering to the rule, that the authority of all extra-judicial bodies must clearly appear, soon would reach beyond the confines of this controversy and might invade the whole field of public control. The only safe and proper roads for administrative bodies like the present commission to travel are those plainly marked by the acts of assembly defining their duties, and to these the courts must confine them, if the system represented by such commissions—to which our body politic seems committed—is to work out as intended by its creators, the legislature.

". . . [B]ut it is for the legislature (and not the courts or the Public Service Commission) to declare the public policy of the state in this regard (Collingdale Boro. v. Phila. R. T. Co., supra; Com. v. Vrooman, 164 Pa. 306, 316), and, when it sees fit to designate the instruments to carry out its declarations, neither the courts nor the commission possess the right to expand or abridge a declaration or grant of power so made. The only legislative declarations we have at this time, on the subject in hand, are those contained in the Public Service Company Law (Act of July 26, 1913, P. L. 1374). . . . Where authority is conferred on an extra-judicial body, 'not in the course of the common law', the legislative grant of power to act in any par-

ticular case must be clear: Citizens P. Ry Co. v. Pub. Serv. Com., 271 Pa. 39, 54."

According to the appellants, we may find in certain sections of the Public Utility Law a direction to PUC to take the action suggested by them. Section 902, 66 P.S. §1342, provides: "In addition to any powers hereinbefore expressly enumerated in this act, the commission shall have full power and authority, and it shall be its duty, to enforce, execute, and carry out, by its regulations, orders, or otherwise, all and singular the provisions of this act, and the full intent thereof; and shall have the power to rescind or modify any such regulations or orders. The express enumeration of the powers of the commission in this act shall not exclude any power which the commission would otherwise have under any of the provisions of this act." Here we note that PUC is to enforce *this act*.

Section 920, 66 P.S. §1360, states:

"The commission shall have power and authority to vary, reform, or revise, upon a fair, reasonable, and equitable basis, any obligations, terms, or conditions of any contract heretofore or hereafter entered into between any public utility and any person, corporation, or municipal corporation, which embrace or concern a public right, benefit, privilege, duty, or franchise, or the grant thereof, or are otherwise affected or concerned with the public interest and the general well being of the Commonwealth.

"Whenever the commission shall determine, after reasonable notice and hearing, upon its own motion or upon complaint, that any such obligations, terms, or conditions are unjust, unreasonable, inequitable, or otherwise contrary or adverse to the public interest and the general well being of the Commonwealth, the commission shall determine and prescribe, by findings and order, the just, reasonable, and equitable obligations,

terms and conditions of such contract. Such contract, as modified by the order of the commission, shall become effective thirty days after service of such order upon the parties to such contract." Where is the contract to be varied, reformed or revised here? And if one could in these circumstances construe the presence of a contract in the alleged failure to hire the appellants' constituents, does it follow that an otherwise justified rate increase should be denied? The provisions at best would give PUC power to alter the offending contract.

Section 419, 66 P.S. §1189, provides: "After reasonable notice and hearing had upon its own motion, or upon complaint, the commission may, by order, require any common carrier to employ such number of men upon any of its facilities as, in the judgment of the commission, is requisite for the safe and efficient operation of such facilities." This is hardly an imposition on the PUC of a duty to investigate discrimination in employment.

Section 413, 66 P.S. §1183, tells us: "Whenever the commission, after reasonable notice and hearing, upon its own motion or upon complaint, finds that the service or facilities of any public utility are unreasonable, unsafe, inadequate, insufficient, or unreasonably discriminatory, or otherwise in violation of this act, the commission shall determine and prescribe, by regulation or order, the reasonable, safe, adequate, sufficient, service or facilities to be observed, furnished, enforced, or employed, including all such repairs, changes, alterations, extensions, substitutions, or improvements in facilities as shall be reasonably necessary and proper for the safety, accommodation, and convenience of the public, and shall fix the same by its order or regulation." It is noted here that the reference is to service or facilities. By Section 2(20), 66 P.S. §1102(20),

service is defined as acts done and things furnished *"under this act."*

Section 914, 66 P.S. §1354, states: "The commission may investigate the interstate rates, traffic facilities, or service of any public utility within this Commonwealth, and, when such rates, facilities or service, are in the determination of the commission, unjust, unreasonable, discriminatory or in violation of any Federal law, or in conflict with the rulings, orders or regulations of any Federal regulatory body, the commission may apply, by petition to the proper Federal regulatory body, for relief, or may present to the proper Federal regulatory body all facts coming to its knowledge as to the violation of the rules, orders, or regulations of such regulatory body, or as to the violation of the particular Federal Law." Again the reference is to rates, facilities and services.

Section 917, 66 P.S. §1357, requires: "Except as otherwise expressly provided, none of the powers or duties conferred or imposed by this act upon the commission, and none of the regulations, orders, certificates, permits or licenses made, registered or issued by the commission, and none of the duties, powers, or limitations of the powers conferred or imposed by this act upon public utilities, contract carriers by motor vehicle, or brokers, or the performance or exercise thereof, shall be construed in anywise to abridge or impair any of the obligations, duties, or liabilities of any public utility, contract carrier by motor vehicle, or broker in equity or under the existing common or statutory law of the Commonwealth; but all such obligations, duties, and liabilities shall be and remain as heretofore. And except as otherwise provided, nothing in this act contained shall in any way abridge or alter the existing rights of action or remedies in equity or under the common or statutory law of the Commonwealth, it

being the intention that the provisions of this act shall be cumulative and in addition to such rights of action and remedies." The relevancy of this reference simply escapes us; it is not contended that the Public Utility Law absolves the Company from compliance with the Pennsylvania Human Relations Act.

Section 301, 66 P.S. §1141, requires rates to be just and reasonable and Section 304, 66 P.S. §1144, prohibits discrimination in rates. These provisions, the appellants say, ". . . must also be understood to encompass within their meaning the unlawful employment discrimination practiced by the utility." Why we are required to take this conclusionary leap is not explained.

The PHRC seeks legislative delegation of authority in PUC to do what is here proposed in the phrase of Section 202, 66 P.S. §1122, that a certificate of public convenience should be issued by PUC "upon compliance with existing laws." But this is not an application to commence a service but a proceeding to obtain what the Company says is its constitutionally guaranteed return for capital devoted to supplying the public with electric service. Reference to this section of the Law does, however, afford the opportunity to comment on *Scenic Hudson Preservation Conference v. F.P.C.,* 354 F. 2d 608 (2d Cir. 1965), *cert. den.* 384 U.S. 941, 86 S. Ct. 1462 (1966), urged upon us as authority for requiring the PUC to here first determine whether the Company is conforming to state human relations policies. There it was decided that the FPC should have considered the ecological and environmental effect of a proposed electric facility under a Federal statute providing that the project to be licensed should be found to be "best adapted to a comprehensive plan for improving or developing a waterway." Obviously, the applicant for a certificate to engage in a regulated busi-

ness or a license to construct a new facility must show conformity to applicable standards, including the public interest. PUC was not here engaged in such an inquiry. Upon this distinction we conclude that other cases[7] cited by the appellants, while of great interest and probable pertinency if the Company here were seeking to go into the utility business, do not support the appellants' position.

We find nothing in the Public Utility Law which explicitly or by implication gives the PUC the power here suggested, accepting as we do the urgency of the public's purpose in eliminating racial discrimination. That some courts have in the interest of implementing public policy accommodated their construction of other statutes to this end, provides no warrant for us to depart from a long and well established rule of the courts of this State that agencies of State government have only those powers granted by clear expression of the Legislature. Further, the cases cited by the appellants for the proposition that the vindication of civil rights should be given the highest priority really do not go so far as to say that this worthy objective must be considered in every action of a regulatory body. *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 88 S. Ct. 964 (1968), and *Jenkins v. United Gas Corp.*, 400 F. 2d 28 (5th Cir. 1968), were actions brought under the Civil Rights Act of 1964, 42 U.S.C.A. §2000(a), *et seq.*, with the central purpose of prosecuting discrimination, not, as here, an effort to advance the charge

---

[7] *Office of Commununciation of United Church of Christ v. F.C.C.*, 359 F. 2d 994 (D.C. Cir. 1966) and 425 F. 2d 543 (D.C. Cir. 1969); *Public Service Commission v. F.P.C.*, 287 F. 2d 146 (D.C. Cir. 1960); *Atlantic Refining Co. v. Public Service Commission*, 360 U.S. 378, 79 S. Ct. 1246 (1959); *I.C.C. v. Railway Labor Executives Assn.*, 315 U.S. 373, 62 S. Ct. 717 (1942); *Kent v. C.A.B.*, 204 F. 2d 263 (2d Cir. 1953).

of discrimination as a reason for denying another a constitutionally protected property right.

*Potomac Electric Power Co. v. Public Service Commission* (D.D.C., C.A., No. 2382-70), where the court held that consideration of employment practices was proper to a rate proceeding is clearly distinguishable from the instant case in that there the public utility law expressly empowers the regulatory body to compel compliance with *all* laws of the United States.

## II—The Fourteenth Amendment

The appellants claim that the consideration of the proposed rate increases without first determining whether the Company is engaged in discriminatory employment practices makes the State a party to racial classification or discrimination. While it is not clear to us how the action of approving, disapproving or modifying the rates a utility charges for electricity is an act of classification or discrimination according to race,[8] we will assume for the purpose of discussion that it is, the Company not having raised the issue. The question of whether the State is here so identified with the Company that the latter's activities are those of the former, remains. The appellants do not persuade us that it is. The cases cited by appellants are not appropriate authority for its bold purpose. *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S. Ct. 856 (1961), dealt with denial to blacks of the use of a restaurant in a *state owned building*. In *Hawkins v. Town of Shaw*, 437 F. 2d 1286 (5th Cir. 1971), a *township* was found to have failed to provide adequate sewers in a black neighborhood. *Smith v. Y.M.C.A.*, 316 F. Supp. 899 (M.D. Ala. 1970), held that a Y.M.C.A.,

---

[8] Does a school district which allegedly engages in the discriminatory practice of maintaining segregated schools discriminate by the act of levying taxes? If so, may such action be enjoined?

heavily subsidized by a municipality, may not discriminate. *Evans v. Newton,* 382 U.S. 296, 86 S. Ct. 486 (1966), involved attempts to convert public property to discriminatory use. In *Ethridge v. Rhodes,* 268 F. Supp. 83 (S.D. Ohio 1967), the State of Ohio was enjoined from entering into contracts for the construction of public buildings which would result in the inability of negroes to obtain employment on the projects. In *Irvis v. Scott,* 318 F. Supp. 1246 (M.D. Pa. 1970), the State's regulations of liquor licensees required adherence to a lodge's constitution specifically mandating exclusion of blacks. In *Seidenberg v. McSorley's Old Ale House,* 308 F. Supp. 1253 (S.D. N.Y. 1969), it was held that a complaint alleging discrimination against women in admission to a licensed premises stated a cause of action under the Civil Rights Act of 1964 as against a motion for dismissal. All of these cases were brought under civil rights legislation seeking direct vindication of such rights. None was an attempt to deny defendant an unquestioned right on account of alleged acts of discrimination unrelated to the complaint. And none dealt with the central issue here of whether a public utility because it is regulated by the State as to rates and service *is* the State.

The Company has directed our attention to *Kadlec v. Illinois Bell Telephone Co.,* 407 F. 2d 624 (7th Cir. 1969). There the utility was sued under the Civil Rights Act for damages for wrongful discontinuance of service. The Circuit Court held that the utility's action was not state action, declaring: "The mere filing of [tariff] regulations with the state neither clothed Illinois Bell with state authority nor did it bring it under aegis of the state." 407 F. 2d at 626. We hold that public utility companies, owned and operated by private interests, under Pennsylvania law and usage, are not so involved with State government as to con-

stitute their action, of whatever nature, state action subject to Fourteenth Amendment protection.

Two other points need mention. NAACP argues that it should have been permitted to intervene in the rate proceeding because of its status as a public interest body regardless of the purpose of its intervention, citing *Scenic Hudson Preservation Conference, supra,* and *Office of Communication of United Church of Christ, supra,* as authority for broader allowance of participation of such groups. As previously noted, in those cases the public interest organizations sought to advance positions clearly relevant to the inquiries. Here, NAACP has nothing to propose concerning rates except that they should not be increased because the Company is allegedly violating an Act dealing, as we view the Pennsylvania Human Relations Act, with an entirely different subject. The Commission had discretion to deny intervention.[9] It was no abuse of that discretion to deny intervention to a proposed party whose only purpose was to urge the Commission to do something not within its power.

Finally, we are informed, as was PUC, that the PHRC has filed with itself a complaint charging the Company with discriminatory employment practices. Section 12(b) of the Pennsylvania Human Relations Act, 43 P.S. §962, provides: "(b) Nothing in this Act shall be deemed to repeal or supersede any of the provisions of any existing or hereafter adopted municipal ordinance, municipal charter or of any law of this Commonwealth relating to discrimination . . . but *as to acts declared unlawful by section five of this act the procedure herein provided shall, when invoked, be exclusive and the final determination therein shall exclude any other action, civil or criminal, based on the*

---

[9] *City of Pittsburgh v. Pa. P.U.C.,* 153 Pa. Superior Ct. 83, 33 A. 2d 641 (1943).

*same grievance of the complainant concerned. . . ."* (Emphasis supplied.) Although we have decided this case on substantive grounds, it would appear that when the procedures of the Pennsylvania Human Relations Act were invoked the PUC's power to act was ended. The dismissal of PHRC's complaint and NAACP's petition would seem to be proper under this provision of the Pennsylvania Human Relations Act.

Order affirmed.

Judge CRUMLISH concurs in the result only.